## Blackberry, Kentucky & West Virginia Coal & Coke Company v. Kentland Coal & Coke Company.

(Decided December 15, 1925.)

### Appeal from Pike Circuit Court.

1. Adverse Possession—In Suit to Quiet Title, Plaintiff Held to Have Acquired Possession Adversely.—Where plaintiff and his predecessors had been in actual, open, notorious and peaceable posses-

sion of property involved in suit to quiet title, claiming under color of title since 1887, held that he had acquired title by adverse possession, regardless of validity of his paper title.

2. Adverse possession—In suit to Quiet Title, Title Bond Held to Sufficiently Describe Property under which Plaintiff Claimed Adversely.—In suit to quiet title, title bond under which plaintiff claimed to hold adversely under color of title, held sufficiently to describe all of property claimed by him.

WILLIS STATON for appellants.

W. G. FLEU, HARMON, HOBSON & FRANCIS and HAGER & STEWART for appellee.

OPINION OF THE COURT BY JUDGE McCANDLESS— Affirming.

On the 21st day of August, 1889, John C. Frances conveyed the minerals in certain lands lying in Pike county to Arthur D. Bright, and on April 1, 1890, H. S. Carter conveyed Bright similar rights in an adjoining tract. Later Bright conveyed the rights in the entire boundary to the Kentland Coal Company, which still retains title.

On the first of March, 1902, Chloe A. Hatfield, formerly Chloe A. Davis, widow of Joseph M. Davis, and Joseph M. Davis, heirs, together with D. A. Pleasants and Walter A. Graham, executed a mining lease to A. H. Carr, etc., for 1,400 acres of land, and this was regularly assigned to the Blackberry, Ky. & W. Va. Coal & Coke Company, and by it sublet to the Alma-Thacker Fuel Company, which has since developed that property. The lines of the latter lease extend over and conflict with the boundary in the deed of the Kentland Coal Company, and this suit was filed by the latter company seeking to quiet its title and to recover the value of the coal alleged to have been taken therefrom. The lessees and surface owners of the Davis lands were made parties defendants. The answer consists of a traverse and counterclaim, asking that defendant's title in the disputed lands be confirmed. During the progress of the case the plaintiff disclaimed title to all lands lying in the head of Peter's fork of Blackberry creek, and the defendants disclaimed title to all lands lying in the John McCoy 400 acre patent and all disputed lands under fence. By agreement the case was submitted on the question of title, the question of damages being deferred. The lower court gave plaintiff judgment for all the lands in dispute lying

in the heads of Pounding Mill branch of Tug fork and Brewer's branch of Peter's creek. Defendants appeal.

The lands in dispute consist of two tracts of about 40 acres each, connected by a narrow strip some forty or fifty feet in width and several hundred yards in length; and lay to the east and southeast of the crest of a hill forming the dividing line between the watersheds of Wolfe Penn fork and Peter's fork of Blackberry creek on the west, and those of Pounding Mill branch of Tug river and Brewer's branch of Peter's creek on the east. Peter's fork of Blackberry creek has a westerly course and is to be distinguished from Peter's creek, which flows east. The ridge mentioned has a general course of from northeast to southwest and the various streams mentioned head upon it as above indicated, it being intersected on the east by another ridge which forms the watershed between Brewer's branch and Pounding Mill branch. A part of the land in dispute is embraced in each of six patents which, taken together, cover it all. The oldest of these is a fifty acre survey patented to Fleming Stafford in August, 1844, and which embraces about six or eight acres of the northern boundary. The next in point of age is the Fleming Stafford 50 acre survey of February 17, 1852, which embraces a large part of the northern tract. The third is the John McCoy 400 acre patent, dated February 3, 1853, which embraces a considerable portion of the southern tract. Fourth: The John McCoy 100 acre patent of August 8, 1853, encloses a strip of the northern tract not included in either of the other two patents. Fifth: The Elexius Stafford patent of 100 acres of April 20, 1860, which conflicts with the Fleming Stafford 50 acre patent of February, 1852, nearly all the disputed land covered by it being embraced in such interference. Lastly, the Elexius Stafford patent of June 27th, 1860, which includes all the disputed land in the southern tract but conflicts with the prior John McCoy 400 acre patent, there being about fifteen acres of disputed land in this interference.

Plaintiff claims a paper title thus:

(1) On the 8th of September, 1869, by deed duly executed, acknowledged and recorded, Fleming Stafford conveyed to Richard Daniels a tract of land, "beginning on a large chestnut standing in the gap at the head of Pounding Mill branch running to the right with the top of the ridge to Wm. P. Cline's line; thence running down

the branch to an ash and sugar tree; thence with the calls and courses of the same to the beginning.''

(2) On the 19th of January, 1870, Richard Daniels by similar deed conveyed to Henry Runyon a boundary on the waters of Pounding Mill branch, ''beginning at the mouth of a drain on the left hand of said branch; thence with a straight line bearing to the right to the corners of a fence to a beech; thence bearing to the left to the top of the ridge; thence with the top of the ridge around the head of said branch to a hickory and oak on the top of the ridge; thence down said drain to the beginning.''

(3) On June 1, 1871, Richard Daniels and Henry Runyon conveyed to Samuel Daniels a boundary, ''beginning at the mouth of a drain on the left-hand side branch; thence with a straight line to the top of the ridge on the right-hand side of said branch; thence around with the dividing ridge to the chestnut, corner in the gap at the head of said branch; thence running with the calls and courses of Henry Runyon's land to the beginning.''

(4) On the 30th of October, 1872, Samuel Daniels and Richard Daniels conveyed to P. A. Cline a boundary, ''beginning at a beech standing just above the mouth of Slick Rock hollow; thence running up the point on the upper side of the hollow to the top of the ridge; thence with the top of the ridge to the head of the Pounding Mill branch; thence around the head of said branch to the Ephram Hatfield branch; thence with our back lines to the head on Fork Point on the William Daniel's branch; thence down said point to the branch; thence with the bed of said branch to Tug river; thence with Tug river to the beginning.''

(5) On August 28th, 1876, P. A. Cline conveyed the boundary last described to Samuel Brewer and (6) on the 17th of September, 1883, Samuel Brewer by commissioner of the Pike circuit court conveyed the same boundary, with immaterial exceptions, to J. C. Frances, who conveyed the minerals to Bright, etc.

Appellee introduced an elaborate map in evidence, and according to its engineer each of these various deeds may be located with reasonable certainty. The chestnut at the Pounging Mill gap is clearly established, as are many other natural objects referred to in this and other deeds to which reference will be made. As located by the engineer the first deed beginning at the chestnut named followed the ridge to the right to the line of Fleming

Stafford's 50 acre survey; thence with that line to the intersection of the line of Wm. T. Cline; thence with the lines of that survey to the coincidence with the Stafford patent of 1844, and from thence with the line of that survey to the beginning. The second and third deeds are also located by him as covering the disputed lands in the heads of Pounding Mill branch and Brewer's branch, but the description in each is rather indefinite and it may be doubted if either of these three boundaries could be established by survey, though this does not apply to the fourth, fifth and sixth deeds *supra*, in which the description seems sufficiently definite.

The defendants also trace title to Fleming Stafford, who on August 19, 1871, conveyed three tracts of land to Wm. J. Sword, this being (1) the Elexus Stafford 100 acre survey of April 20, 1860; (2) the Fleming Stafford 50 acre patent dated February 17, 1852; (3) the Elexius Stafford patent of 150 acres of June 27, 1860. In it reference is made to "certain tracts or parcels of land lying . . . in Peter's fork of Blackberry creek." But each of the patents named extend over the ridge and include lands in the heads of the other branches.

On November 27, 1872, Wm. Sword conveyed two of these boundaries to M. G. B. Davis. These were: (1) the Elexius Stafford survey of April 20, 1860; (2) so much of the Elexius Stafford 150 acre patent as lay in the watershed of Peter's fork of Blackberry creek, the eastern boundary of the tract as described in the deed being "from a dogwood, beech and chestnut in the gap up the point between Pounding Mill branch and Peter fork to the top of the ridge between Pounding Mill branch and W. P. Cline branch; thence with the back line to the beginning." It will be observed that neither of the Fleming Stafford 50 acre patents was included in this deed. The 100 acre Elexius Stafford patent was included but it was inferior to the others, and no part of the disputed land in the 50 acre patent passed thereby. Also the 150 acre Elexius Stafford patent includes the southern tract of disputed land, but in this deed its eastern boundary was restricted to the ridge above mentioned, and therefore but little, if any, of the disputed land was conveyed. It is further observed that the deeds from Frances to Daniels under which plaintiff claims and the deeds from Frances to Sword under which defendant claims each embraced lands in the Elexius Stafford patents. It does not appear how Fleming Stafford acquired title to this,

but in the latter deed appears this recital, "The portion of said land having descended to me from Elexius Stafford, my son." We will not now stop to inquire as to the weight of this recital.

Aside from the deeds *supra,* on September 15, 1869, W. O. B. Ratcliffe, commissioner, conveyed to M. G. B. Davis, certain lands of John McCoy, deceased. These lands were not described in the deed but are identified in evidence as being the two McCoy patents above mentioned. On the 24th of July, 1871, M. G. B. Davis executed to Payton Johnson a deed for 300 acres, more or less, of the McCoy survey, lying on Peter fork of Tug river. It is admitted that this deed includes part of the 400 acre McCoy patent, and that later, this boundary was conveyed to H. S. Carter. It clearly embraces the lands in dispute at the head of Brewer's branch and practically all the 400 acre patent not included in prior grant to McCoy.

The sale to Johnson left M. G. B. Davis the ostensible owner of the 100 acre McCoy patent. This was a long, narrow tract of land running east and west, lying for the most part at the head of right fork of Pounding Mill branch and including about 15 acres of the disputed land, and extending over the ridge into the head of Peter fork of Blackberry creek. He also at that time had deeds covering the Elexius Stafford 100 acre survey of April 1860; that part of the Elexius Stafford 150 acre survey lying on Peter's fork of Blackberry creek and so much of the John McCoy 400 acre survey as did not lie in the Brewer's branch watershed. The latter survey conflicted with a senior patent issued to W. T. Cline in November, 1847, leaving very little of the junior patent as valid. The Cline patent, however, included none of the land involved in this action. In this condition of the title on May 11, 1887, Fayette Hewett, as auditor of the state of Kentucky, conveyed to John C. Frances, "One tract of land lying and being in Pike county in the state of Kentucky in precinct 7 of Pounding Mill branch and Peter's fork of Blackberry creek assessed in the name of M. G. B. Davis and sold for taxes for the years 1880 and 1883." Davis was much agitated over this deed and went to Frances' home weeping and pleading for a reconveyance, offering terms. D. J. Wolford, a brother-in-law of Frances and deputy clerk of Pike county, who was present, testifies that his sympathy was aroused and that he prevailed upon Frances to accept, and that it was

agreed that in consideration of $25.00 paid Frances by Davis, that Frances should convey to Davis all the lands lying in Peter's fork of Blackberry creek, and should keep all the lands lying on Pounding Mill branch, the ridge between the two watersheds to be the line between them. That he drew separate title bonds embodying this agreement, which were executed by the parties, witnessed by him and severally delivered at the time. In this he is corroborated by Ran Blackburn and Sylvania Bryant, former wife of John C. Frances. Both of the title bonds are lost, but it appears that some ten years later a suit was brought by J. B. Slater and J. M. Davis, a son of G. M. B. Davis, against the heirs of G. M. B. Davis and the heirs of John C. Frances for specific performance of that title bond, and that in conformity thereto on June 27, 1896, a commissioner's deed was executed to Davis and Slater conveying a tract of land "Situated, lying and being in Pike county, Kentucky, on Peter fork of Blackberry creek, a tributary of Tug river, said lands being bounded as follows: "On the southeast by the lands of M. A. Lawson, on the east and west by the lines of J. M. Davis and on the north by same," and that on the — day of —, 1896, Slater conveyed his interest therein to J. M. Davis, and defendants rely on this deed as establishing their title to the disputed lands at the head of Pounding Mill branch. The records in that case are not in evidence, but W. J. Marrs, the attorney who brought the suit for J. M. Davis, testifies that it is based on the title bond mentioned above, and his memory is clear that this called for the top of the ridge as the division line between Davis and Frances. Prior to this in the year 1894, J. M. Davis had conveyed all his land to his wife, Chloe Davis, and described it as being "on Tug river, Blackberry creek and Peter's fork of Blackberry creek." It does not appear that the deed to Slater and Davis and that from Slater to J. M. Davis embraced the disputed land. J. B. Slater testifies that he and J. M. Davis purchased the land on Peter's fork of Blackberry creek of G. M. B. Davis; that M. A. Lawson and Peyton Johnson owned the lands beyond the watershed, but were claiming that their boundary extended across the ridge and sued him and Davis for cutting timber thereon, and in which he and Davis were successful; that Davis brought suit for the title and he afterwards conveyed to Davis, but says that it was understood all of the time that the ridge formed the boundary and that it was so stated in their

title bond and that they exercised no acts of ownership beyond it. Later the lands of J. M. Davis were sold under execution and purchased by his wife, Chloe Davis, who received commissioner's deed therefor. There is also in the record a commissioner's deed to J. M. Davis executed on the 13th day of March, 1896, in a suit of J. M. Davis v. Samuel Farrel, etc., in which several tracts of land were sold, including the William Cecil patents, the 150 acre Elexius Stafford patent, but no title to the lands in controversy is shown in any of the parties to that suit. The case is further complicated by a deed executed by Fleming Stafford to Elexius, Hammond and Farrell Stafford on the 1st of March, 1858, conveying the Fleming Stafford 50 acre patent of 1844, and other lands. On June 13, 1905, Farrell Stafford, claiming to act as attorney-in-fact for the heirs of Elexius Stafford, made a title bond to J. E. Goslin to several tracts of land, including the Fleming Stafford 50 acre patent. On the 13th day of February, 1920, J. E. Stafford made a similar bond to J. E. Goslin, and on the 1st day of March, 1920, J. E. Goslin executed a title bond to appellants for same.

In the voluminous record reference is made to many other deeds and patents not necessary to a decision of this case and which space forbids us to mention, and much evidence was introduced on the question of adverse possession, to which reference will be made later. Without reviewing the title papers indicated above, it is a matter of great doubt if either of the parties has shown a connected paper title. We have seen that no title to the disputed lands passed to G. M. B. Davis under the Sword deed. He later acquired title to about 15 acres of it by virtue of the purchase of the 100 acre McCoy patent, but under the proof there is no question but that this was surrendered by the execution of the title bond to J. C. Frances. None of the parties to the Farrell suit is shown to have any title to these lands, hence none passed by the commissioner's deed in that action. The evidence, to which we shall later allude, clearly shows that the title bonds to Goslin and that executed to him by defendant were champertous, hence defendants cannot rely on paper title. Also plaintiff's paper title is doubtful. We have seen that it run back to Fleming Stafford. If Fleming Stafford conveyed the 50 acre patent of 1844 to his three sons in 1858, he was without title to much of the land conveyed by him to Henry Daniels, except that embraced in the 50 acre patent of 1852, which was not embraced in

the deed to his sons. Also in the Daniels deed, as well as the two succeeding deeds under which plaintiff claims, the boundaries are not clearly defined, and perhaps it would be difficult to show just what lands are embraced by them, though the succeeding deeds, aside from the auditor's deed, clearly describe the land in controversy, but it is not essential to determine the validity of plaintiff's paper title as we think that it has at least shown title by adverse possession. From the time Henry Daniels was placed in possession in 1869, he and his successors in title have been in continuous possession of the tract conveyed to him. For the reasons suggested above under the first three deeds perhaps that possession would not be extended beyond his enclosures, but the succeeding deeds were sufficient to indicate the extent of possession, and this is clearly true of the title bond which was executed between the years 1885 and 1887, several years before Frances' deed to Bright. It is clearly proven that during all the period from that date to this Frances' successors and vendees have lived upon and been in the actual, open, notorious and peaceable possession of all the land in the head of Pounding Mill branch, claiming same under color of title to well described boundaries, some of which has been enclosed by fences and cultivated for forty years. The continued possession of surface owners claiming under Frances would of course inure to the benefit of his mineral vendee.

It is argued, however, that the title bond was of no effect because the auditor's deed upon which it was based was void for uncertainty, or that if the land described in that deed could be located it embraced only the McCoy 100 acre patent and that the western part of that patent was all that was embraced in the title bond. It is further argued that independent of this the commissioner's deed made in pursuance of the title bond gave to defendant's vendor the land in controversy and was a settlement of the matter or at any rate stopped the running of the statute of limitation. We are not impressed with either of these propositions. The description in the auditor's deed was indefinite, but the parties considered it seriously and it was a sufficient consideration for the title bonds. These bonds were established by irrefutable parol evidence and are shown to have fixed the dividing line on the crest of the ridge as claimed by Francis and left him in possession of the entire head of Pounding Mill branch, nor does the deed of June 27, 1896, to Slater and Davis

negative this fact, the description being, "On the south and east by the lands of Johnson and Lawson; on the north, east and west by the lands of J. M. Davis." The Johnson and Lawson lands were south and east or southeast of this ridge and are admitted by defendants to be the same lands conveyed plaintiff by H. S. Carter, which would include the lands in dispute in the Brewer's branch head. It is not shown that Davis owned any lands to the east of those now in controversy, and in view of the fact that the title bond under which suit was brought conceded the lands in dispute to Frances' heirs and that they were left in undisturbed possession after its rendition it cannot be said that this suit adjudged the lands in the heads of Brewer's fork and Pounding Mill branch against them. As it is shown that these lands were clearly in the adverse possession of Frances' successors in title at the time the title bonds were executed to Goslin and by him to defendants those instruments were ineffectual for any purpose. Defendants also claim title by adverse possession, but so far as the proof shows no one under whom they claim has ever been in actual possession of any of the land east of the ridge, and in view of the facts above stated it is not necessary to discuss that feature of the case further. Our views are further strengthened by the opinion of the chancellor, who was familiar with the situation and acquainted with the parties.

Wherefore, perceiving no error, the judgment is affirmed.